1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GEORGE FREDERICKS,

11              Petitioner,              No. CIV S-05-334 MCE KJM P

12        vs.

13   CLAUDE FINN, Warden,[1]

14              Respondent.         FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus challenging a 2003 denial of parole.

18   I.  Background

19              In 1981, petitioner was convicted of first degree murder and sentenced to an

20   indeterminate term of twenty-five-years-to-life.  Answer, Ex. 1.  In its 2003 decision denying

21   parole, the hearing panel described the offense and gave its reasons for its determination:

22              The Panel's reviewed all information received from the public and
               relied on the following circumstances in concluding that the
23              prisoner is not suitable for parole and would pose an unreasonable
               risk of danger to society or a threat to public safety if released from
24              prison at this time.  The paramount reason would be the timing and

25   _____

26        [1]  The court substitutes the current warden of Deuel Vocational Institution for his
     predecessor.  Fed.R.Civ.P. 25(d)(1).

                                         1

the gravity of the committing offense. The offense was carried out
in an especially vicious and brutal manner. The offense was
carried out in a dispassionate and calculated manner. The offense
was carried out in a manner which demonstrates an exceptionally
callous disregard for human sufferings. The motive for the crime
was inexplicable and very trivial in relationship to the offense, over
drugs and money, wherein the prisoner knew the victim, was an
acquaintance of the victim, Lonny William Roper. He was 41
years of age. The victim was lured to a remote spot or area and at
some point in time the victim was gunned down. He was shot at
least some eight times, according to the reports, which indicate
eight bullet entry wounds. The prisoner was a deserter at the time
from the Marine Corps, as well as the prisoner was dealing in
cocaine, illegal substances. These conclusions are drawn from the
Statement of Facts wherein the petitioner and his crime partner
caused the demise of Mr. Lonny William Roper[2]. . . . Previous
record – The prisoner has a minimum history of criminality,
actually really none other than he was – had a problem with an
unstable history of tumultuous relationships with others in terms of
being AWOL . . . . Psychosocial report was adequate. Parole
plans–The prisoner does not have a viable employment plan at this
time, a verifiable employment plan, I should say. 3042
notices–The hearing Panel notes responses to 3042 notices indicate
opposition to a finding of suitability, specifically the District
Attorney's Office of San Diego County wrote a letter in opposition
. . . . And then there was a letter as well from the San Diego
County Sheriff's Department. . . , which was the law enforcement
agency which investigated the particular case. As well as there
were two letters from the victim's next-of-kin, his daughter as well
as his wife, in opposition to a finding of suitability. Other
information–let's see–would be that in terms of institutional
behavior the prisoner has not sufficiently participated in beneficial
self-help and therapy and programming at this time. Remarks–The
Panel makes the following findings, that the prisoner needs therapy
in order to face, discuss, understand, and cope with stress in a
nondestructive manner, to better understand the causative factors . .
. of why the prisoner began to get in the drug dealing lifestyle, the
drug use lifestyle, causing him to escalate into the murder of a
friend and acquaintance. Until progress is made, the prisoner
continues to be unpredictable and a threat to others. The prisoner's

---

[2] Earlier during the hearing, one of the commissioners read from a document which
reported that the victim had been shot seventeen times. Petitioner directed his attention to a
sheriff's department report, which noted eight wounds on the victim. Transcript at 12, 13.
Petitioner also told the commissioners that his co-defendant, Paul Thomas, had shot Roper,
something Thomas had confirmed during his own parole hearing. Id. at 14. Petitioner conceded
he owed Roper money for drugs, but denied he had set Roper up for robbery and murder. Id. at
15-16. He said Thomas shot Roper only after Roper had pulled a gun on them. Id. at 17. It
appears petitioner first told this version of the crime to the panel in 2000. Id. at 19.

2

1  gains are recent.  He must demonstrate the ability to maintain these
   gains over an extended period of time.  And I'm referring to being
2  disciplinary-free since 1998.  This is a positive.  He's participated
   in Anger Management in the past, positive work reports.  He's
3  achieved some 21 out of 36 . . . Vocational Electronic Computer
   Repair Program certificates.  However, these positive aspects of his
4  behavior do not outweigh the factors of unsuitability at this time.
   This is a two-year denial, Mr. Fredericks.
5

6  Transcript at 69-72.[3]

7          Petitioner pursued an administrative appeal and then filed collateral attacks in San

8  Diego County Superior Court, the Court of Appeal for the Fourth Appellate District, and the

9  California Supreme Court.  Pet., Ex. A (state court denials); Answer, Ex. 2 (Court of Appeal

10 denial).

11 II.  Standards Under The AEDPA

12         An application for a writ of habeas corpus by a person in custody under a

13 judgment of a state court can be granted only for violations of the Constitution or laws of the

14 United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

15 claim decided on the merits in state court proceedings unless the state court's adjudication of the

16 claim:

17          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established federal law, as
18          determined by the Supreme Court of the United States; or

19          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
20          State court proceeding.

21 28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

22 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

23

24         [3]  Respondent has not submitted a copy of the 2003 transcript, appearing to rely instead
   on that attached to the petition.  Petitioner has provided a number of records; the transcript of the
25 hearing is an exhibit to the state habeas petition he filed in the Superior Court.  In order to avoid
   confusion, the court will refer to documents by their name rather than by any overlapping exhibit
26 designations.

1  under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

2  Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

3  U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

4  not address the merits of petitioner's Eighth Amendment claim).[4]  Courts are not required to

5  address the merits of a particular claim, but may simply deny a habeas application on the ground

6  that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

7  Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

8  courts to review state court decisions for error before determining whether relief is precluded by

9  § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

10  by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

11          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

12  different.  As the Supreme Court has explained:

13          A federal habeas court may issue the writ under the "contrary to"
           clause if the state court applies a rule different from the governing
14          law set forth in our cases, or if it decides a case differently than we
           have done on a set of materially indistinguishable facts.  The court
15          may grant relief under the "unreasonable application" clause if the
           state court correctly identifies the governing legal principle from
16          our decisions but unreasonably applies it to the facts of the
           particular case.  The focus of the latter inquiry is on whether the
17          state court's application of clearly established federal law is
           objectively unreasonable, and we stressed in Williams [v. Taylor,
18          529 U.S. 362 (2000)] that an unreasonable application is different
           from an incorrect one.

19

20  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

21  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

22  _____

23          [4]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
    held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
24  claims will have no determinative effect in the case before us . . .  At best, it is constitutional
    dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
25  relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
    28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
26  of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
    Ramirez, 365 F.3d at 773-75.

1  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

2  (2002).

3          The court will look to the last reasoned state court decision in determining

4  whether the law applied to a particular claim by the state courts was contrary to the law set forth

5  in the cases of the United States Supreme Court or whether an unreasonable application of such

6  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

7  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

8  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

9  must perform an independent review of the record to ascertain whether the state court decision

10  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

11  words, the court assumes the state court applied the correct law, and analyzes whether the

12  decision of the state court was based on an objectively unreasonable application of that law.

13          It is appropriate to look to lower federal court decisions to determine what law has

14  been "clearly established" by the Supreme Court and the reasonableness of a particular

15  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

16  III.  Analysis

17          Petitioner alleges that California Penal Code section 3041 creates a

18  liberty interest in parole; that he has been denied parole repeatedly even though there is no

19  evidence he would pose an unreasonable threat to public safety if released; that the Board relies

20  on the same factors for every denial; and that there is a de facto "no parole" policy in the state.

21  Pet., Mem. P. & A. at 1.[5]

22  /////

23

24          [5] Petitioner also argues that the Board of Prison Terms (BPT) has failed to set a base term
and so his term has become disproportionate to the "uniform" term specified in the Penal Code.
25  Respondent's motion to dismiss this aspect of the habeas petition was granted, though denied in
all other respects.  Order filed 3/31/06.  Accordingly, the court does not address arguments I and
26  IV of the petition.

The last reasoned state court decision was issued by the Court of Appeal:

In 1981 petitioner was convicted of first degree murder and sentenced to 26 years to life.  In 2003 the Board of Prison Terms (the Board) found him unsuitable for parole. . . .

Petitioner contends: 1) the Board is ignoring petitioner's liberty interest in a presumptive parole date under Penal Code section 3041; 2 and 3) there is no evidence to support the Board's findings he is unsuitable for parole and he poses an unreasonable risk of danger to society if released; 4) the Board and the former Governor have pursued an illegal no parole policy; 5) the Board must establish a primary term based on individual culpability and do a proportionality analysis; and 6) denial of parole despite having complied with previous Board recommendations violates due process.

The Board is authorized to determine parole suitability and exercises discretion in deciding whether to grant or deny parole.  It must grant parole unless it determines the public safety requires a further incarceration because of the gravity of the offense underlying the conviction or that after considering the circumstances enumerated in regulations that the prisoner is unsuitable for parole.  We uphold the Board's decision if it is supported by "some evidence" based on the factors specified by statute and regulation.

At the time of the life crime, petitioner (a deserter from the Marine Corp [sic]) was involved in a criminal and drug lifestyle.  He knew his victim with whom he was involved in drug trade.  He lured his victim to a remote spot where he and/or his accomplice shot the victim multiple times.  They thereafter undertook extensive acts to conceal the crime.  The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. Here, however, additional evidence supports the finding of unsuitability including six serious rules violations while in prison (the most recent for dangerous contraband in 1998) and a counselor's negative report that petitioner is not a viable candidate for release as he has not progressed sufficiently to assure the safety and security of society.  Additionally, petitioner did not have verifiable employment plans.  "Some" evidence supports the Board's findings petitioner posed an unreasonable risk of danger to society and was unsuitable for parole.  We reject petitioner's argument that the Board was required to perform a proportionality review to determine suitability for parole and find no merit to his remaining contentions.

Answer, Ex. 2 at 1-3 (internal quotations, citations and footnote omitted).

//////

6

1    A. Parole in California

2    In Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7, 11 (1979), the United

3    States Supreme Court found that an inmate has "no constitutional or inherent right" to parole,

4    even when a state establishes a system of conditional release from confinement.  The Court

5    recognized, however, that the structure of parole statutes might give rise to a liberty interest in

6    parole that would, in turn, mean an inmate was entitled to certain procedural protections.  Id. at

7    14-15.  In Greenholtz, the Court found that the "mandatory language and the structure of the

8    Nebraska statute at issue" created such a liberty interest.  Board of Pardons v. Allen (Allen), 482

9    U.S. 369, 371 (1987).

10   In McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), the Ninth Circuit used the

11   Greenholtz-Allen framework to determine whether California statutes created a liberty interest in

12   parole.  The critical statute at issue in McQuillion is California Penal Code section 3041, which

13   provides in relevant part:

14   (a) In the case of any prisoner sentenced pursuant to any provision
     of law, other than [the determinate sentencing law], the Board of
15   Prison Terms shall meet with each such inmate during the third
     year of incarceration for the purposes of reviewing the inmate's
16   file, making recommendations, and documenting activities and
     conduct pertinent to granting or withholding post-conviction credit.
17   One year prior to the inmate's minimum eligible parole release date
     a panel consisting of at least two commissioners of the Board of
18   Prison Terms shall again meet with the inmate and shall normally
     set a parole release date as provided in Section 3041.5.[6] The release
19   date shall be set in a manner that will provide uniform terms for
     offenses of similar gravity and magnitude in respect to their threat
20   to the public, and that will comply with the sentencing rules that
     the Judicial Council may issue and any sentencing information
21   relevant to the setting of parole release dates. The board shall
     establish criteria for the setting of parole release dates and in doing
22   so shall consider the number of victims of the crime for which the
     prisoner was sentenced and other factors in mitigation or
23   aggravation of the crime....

24   /////

25   _____

26      [6] Cal. Penal Code § 3041.5 establishes procedural requirements for Board hearings.

1
2
3
4

> (b) The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

5   The Ninth Circuit found that subdivision (b) was like the statutes in both

6   Greenholtz and Allen:

7
8
9

> California's parole scheme gives rise to a cognizable liberty interest in release on parole. The scheme "'creates a presumption that parole release will be granted'" unless the statutorily defined determinations are made.

10  McQuillion, 306 F.3d at 901-02.  Again in Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003),

11  the Court of Appeals reiterated its holding that the California parole scheme created a liberty

12  interest in parole, noting that "California Penal Code § 3041(b) controls" the resolution of the

13  question because its "language clearly parallels the language" under consideration in Greenholtz

14  and Allen.  See also In re Rosenkrantz, 29 Cal.4th 616, 654 (2002), cert. denied, 538 U.S. 980

15  (2003) (discussing § 3041(b), the California Supreme Court noted "parole applicants . . . have an

16  expectation that they will be granted parole unless the Board finds . . . that they are unsuitable in

17  light of the circumstances specified by statute and regulation").

18      The existence of a liberty interest means that a decision to deny parole must be

19  supported by some evidence and not be otherwise arbitrary.  Superintendent v. Hill, 472 U.S.

20  445, 457 (1985); Jancsek v. Oregon Board of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  The

21  test is "not whether some evidence supports the reasons . . . for denying parole, but whether

22  some evidence indicates a parolee's release unreasonably endangers public safety."  In re Lee,

23  143 Cal.App.4th 1400, 1408 (2006) (emphasis in original).  The evidence must have some

24  indicia of reliability.  Biggs, 334 F.3d at 915.  The "some evidence" requirement is a "minimally

25  stringent" standard and does not require the court to reweigh the evidence or examine the entire

26  record.  Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994); Hill, 472 U.S. at 455-56.

> [The] analysis is framed by the statutes and regulations governing parole suitability determinations . . . . [W]e must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" . . . constituted an unreasonable application of the "some evidence" principle articulated in *Hill*.

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) (internal citations omitted).

The Board's regulations for setting parole release dates are found in title 15 of the California Code of Regulations.  Section 2401 of this title provides:

> A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.
>
> In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.
>
> The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

15 Cal. Code Regs. § 2401.

Section 2402 provides:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

/////

9

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

/////

/////

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

/////

/////

11

1         (9) Institutional Behavior. Institutional activities indicate an
      enhanced ability to function within the law upon release.

2

3   15 Cal. Code Regs. § 2402.

4         Once the Board determines that an inmate is suitable for parole, it proceeds to set

5   a date for the inmate's release, based on numerous factors provided in sections 2403 through

6   2411.  The paramount concern in determining parole suitability is public safety.  In re

7   Dannenberg, 34 Cal.4th at 1080, 1084, 1085, 1086 ("the overriding statutory concern" is for

8   public safety; purpose of the statutes is to "guarantee that the Board has fully addressed the

9   public safety implications" of the release determination).

10        B.  No Parole Policy (Argument VI)

11        Petitioner relies on a declaration from Albert Leddy, the former Chair of the

12  Board of Prison Terms, and statistics  gleaned from an unpublished decision of the Santa Clara

13  County Superior Court, as well as a statement from Board member Giaquinto during another

14  inmate's hearing[7] to argue that California's governors have followed a "no parole" policy, which

15  has informed the Board's determinations of suitability.   Pet., Mem. P. & A. at 37-43. While this

16  information is suggestive, petitioner has not borne his burden of demonstrating that such a policy

17  exists; indeed, he has made a statistical argument without providing the data to permit the court

18  to evaluate his conclusions.  This is insufficent to meet his burden.  Silva v. Woodford, 279 F.3d

19  825, 835 (9th Cir. 2002) (petitioner's burden to show he is in custody in violation of the

20  constitution).

21        C.  Denial Of Parole (Arguments II, III and V)

22        Petitioner argues there is no evidence that he is unsuitable for parole or that he

23  would pose a danger if released.  He also argues he has complied with the recommendations

24  made during previous parole panel hearings-- he has remained disciplinary free, attended self-

25

26      [7] "Of all the lifers we see, we see 10 or 11,000 of them.  There's very, very few that even
have a chance of looking at parole."  Pet., Page from 1996 Hearing of Richard Donaldson.

1   help and therapy sessions, and upgraded vocationally–, meaning the 2003 denial of parole

2   violates due process.

3         1.   The Nature Of The Offense

4         Both the Board and the state Court of Appeal relied on the nature of the offense as

5   one reason for the denial of parole.  Petitioner told the panel that his crime partner had shot

6   Roper and argued that he and his co-defendant had not intended to rob Roper.  Transcript at 15-

7   18.  He did not dispute, however, that the encounter with Roper occurred because of petitioner's

8   $1500 drug debt and that he brought an armed man with him to the meeting because of Roper's

9   prior unpleasantness over the debt.  Id. at 14-15, 18.

10        Although Roper was shot eight times, there is nothing in the record to suggest that

11  he suffered or that the crime was otherwise particularly violent.  In re Dannenberg, 34 Cal.4th at

12  1095 (a murder is "particularly egregious" if there is violence or viciousness beyond what is

13  minimally necessary for conviction).

14        However, there is some evidence supporting the Board's reliance on the nature of

15  the offense to deny parole.  In reVan Houten, 116 Cal.App.4th 339, 352 (2004), the Court of

16  Appeal held that if an offense is accompanied by special circumstances that might have justified

17  the imposition of a sentence of life without the possibility of parole or death, these are

18  "particularly egregious acts beyond the minimum necessary to sustain the conviction." (Internal

19  citation, quotation omitted.)  In this case, petitioner was convicted of robbery in connection with

20  the murder; murder committed in connection with a robbery may be subject to special

21  circumstances.  Cal. Pen. Code § 190.2(a)(17)(A).[8]

22        Moreover, as the Board recognized, whether or not petitioner originally planned to

23  kill Roper, he and his armed crime partner lured Roper to a remote area because of a $1500 drug

24

25        [8] Petitioner disputes this version of the offense: he explains that the information about a
    robbery came from an unreliable informant while in reality he had not planned to rob Roper.
    Transcript at 16.  He has provided no evidence of this account to either the Board or the
26  California courts and has presented nothing in the current proceedings.

1   dealing debt.  There is some evidence, therefore, that the motive was trivial.  This, in turn,

2   suggests petitioner may still pose some danger to society if released.

3           Petitioner also argues that the Board has continued to rely on the nature of the

4   offense in denying parole.  Pet., Mem. P. & A. at 21; see also 1995 parole denial at 1 ("First of

5   all is the commitment offense . . . .); 2000 parole denial at 3 ("The offense was carried out in a

6   callous manner.  The offense was carried out in a manner which exhibits an exceptional disregard

7   for human suffering.").  In Biggs, 334 F.3d at 916, the Ninth Circuit suggested that

8           [o]ver time. . . should Biggs continue to demonstrate exemplary
            behavior and evidence of rehabilitation, denying him a parole date
9           simply because of the nature of Biggs' offense and prior conduct
            would raise serious questions involving his liberty interest in
10          parole.

11  See also Sass v. California Board of Prison Terms, 461 F.3d 1123, 1129 (9th Cir. 2006).

12          However, in Irons, the court said:

13          We note that in all the cases in which we have held that a parole
            board's decision to deem a prisoner unsuitable for parole solely on
14          the basis of his commitment offense comports with due process,
            the decision was made before the inmate had served the minimum
15          number of years required by his sentence. . . . All we held in those
            cases and all we hold today, therefore, is that, given the particular
16          circumstances of the offenses in these cases, due process was not
            violated when these prisoners were deemed unsuitable for parole
17          prior to the expiration of their minimum terms.

18  505 F.3d at 853-54.

19          In California, an inmate has a minimum eligible parole date (MEPD), which is the

20  earliest date a "life prisoner may legally be released on parole."  15 Cal. Code Regs.

21  § 2000(b)(67).  At the time petitioner was sentenced, this date was computed by applying

22  postsentence good time and work time credits to the minimum term of twenty five years for first

23  degree murder.  See In re Dayan, 231 Cal.App. 3d 184, 186 (1991).

24          Petitioner's  MEPD was May 7, 1996.  Transcript at 1.  However, it is not clear

25  whether the minimum term in Irons is the MEPD or the term of years.  At the time of the 2003

26  parole hearing, petitioner had not reached his minimum term of twenty five years for first degree

1   murder.  In light of the decision in Irons, including the ambiguity therein, the Board's continued

2   reliance on the circumstances of the crime in this case did not violate due process.  The

3   extremely deferential standard of review under the AEDPA also informs the conclusion here that

4   the Court of Appeal's determination was not unreasonable.

5           2.  Unstable Social History

6           Petitioner does not dispute that he was AWOL from the Marines at the time of the

7   killing and that his desertion was the result of his drug abuse.  Transcript at 23.  Once again,

8   while continued reliance on this factor into the future may pose problems, this court cannot say

9   that the Board and the state courts erred in finding this initial instability provided some evidence

10  in 2003 of continued dangerousness.

11          3.  Institutional Behavior

12          Petitioner has presented a number of laudatory chronos and certificates, showing

13  that he has worked and studied steadily and has volunteered for projects within his expertise with

14  electronic equipment.   Nevertheless, in 2003 he had received six disciplinary write-ups, the most

15  recent in 1997 and 1998 for possession of contraband.  Traverse, Ex. 5.  Here again, this court

16  cannot say the state court erred in relying on this factor as suggestive of dangerousness.

17          4.  Counselor's Report And Need For Self-Help

18          Petitioner's counselor noted that petitioner was an active participant in Narcotics

19  Anonymous, had received a certificate from an anger management program, and undertaken a

20  computer repair course.   The counselor concluded, however, that petitioner was not ready for

21  release because he had not secured an offer of employment and suggested that petitioner's

22  acceptance of responsibility for the crime was so recent that he would benefit from therapy.

23  Traverse, Ex. 3.

24          At his hearing, petitioner objected to the report, relying instead on psychiatric

25  evaluations finding no need for therapy.  Pet., 1999 Evaluation at 3 ("no mental health treatment

26  is indicated at this time" and "he understands the effect the drugs had as a causative factor. . . .");

15

1   Id., 1987 Evaluation ("the only psychiatric recommendation . . . is that should any self-help group

2   become available for drug avoidance here, then he should participate").  Moreover, he noted that

3   the report itself found that petitioner would be employable because of his computer skills.

4   Traverse, Ex. 3 at 4.

5           Because the counselor's 2003 report is contradicted by prior psychiatric

6   evaluations and is internally contradictory, it is not reliable.  The Court of Appeal erred in relying

7   on it to uphold the Board's decision.

8           The Board also found that petitioner needed additional therapy to understand his

9   descent into a drug-related lifestyle.  This conclusion is not supported by the evidence, however,

10  in light of the 1999 psychiatric report.  While the report recommended some form of self-help

11  relating to drug use, by 2003 petitioner had particpated in Narcotics Anonymous for several years

12  and was able to discuss the eighth step with the commissioners.  Transcript at 28, 37.  This aspect

13  of the Board's denial thus is not supported by the requisite "some evidence."

14          5.  Employment

15          Although petitioner did not present firm employment plans to the panel, even the

16  counselor's report found that petitioner's "recent training will enable him to find a job without

17  much effort."  Traverse, Ex. 3; see also id., Ex. 4 (Board report, noting petitioner's solid

18  vocational training). The link between petitioner's failure to secure firm employment plans and

19  dangerousness also is not supported by the requisite "some evidence."

20          6.  Fulfilment Of Recommendations From Earlier Panels

21          Petitioner argues that the denial of parole after he has satisfied earlier

22  recommendations violates due process.  However, because there is some evidence to support the

23  denial of parole, petitioner's compliance with the recommendations of earlier panels does not

24  render the decision arbitrary.  See Cass v. Woodford, 432 F.Supp.2d 1061, 1075 (S.D. Cal. 2006);

25  Bonsall v. Gillis, 372 F.Supp.2d 805, 807-08 (M.D. Pa. 2005).

26  /////

1    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

2    writ of habeas corpus be denied.

3    These findings and recommendations are submitted to the United States District

4    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5    days after being served with these findings and recommendations, any party may file written

6    objections with the court and serve a copy on all parties.  Such a document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8    shall be served and filed within ten days after service of the objections.  The parties are advised

9    that failure to file objections within the specified time may waive the right to appeal the District

10   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11   DATED:  December 18, 2007.

12

13   _____

14   U.S. MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26